**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | No.   **21-cr-706 (APM)** |
| **SEREIKA SAVARIAU** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

Sereika Savariau, by her attorney, Maria N. Jacob, submits the following memorandum in aid of sentencing in this matter.

Ms. Savariau is a Jamaican citizen who has agreed to be deported back to her home country when her sentence is complete. The government extradited her here solely for this criminal prosecution and in doing so she was stripped from her home, daughter, and life that she knew in Jamaica. She has been detained at the Alexandria Detention Center ("ADC") since September 8, 2023, and was arrested in her home country on July 6, 2023.

Ms. Savariau is only one among several other more culpable co-conspirators who has been charged and convicted in this conspiracy. Prior to being arrested for the instant matter, she was completely destitute and living with her grandmother and daughter in an impoverished area of Jamaica. She was struggling to make ends meet for herself and her daughter after years of struggling to find work and build a career for herself.

1

Ms. Savariau had a sad and traumatic childhood, filled with abuse and neglect by the family who was supposed to protect her. She then married the wrong person who got her caught up in the mess that she is in today. Ms. Savariau was then stalked and threatened because of her involvement and has had to endure countless trauma at the hands of more serious and dangerous co-conspirators. She also had to raise her daughter in complete poverty struggling to put food on the table.

Ms. Savariau understands how serious this offense is and is very remorseful for her role in the victims' suffering. Even though none of her other co-conspirators have had to answer for their crimes, she has accepted responsibility in this case and is asking the Court to consider her unique mitigating circumstances and the rest of the 3553(a) factors when fashioning her sentence.

Based on the reasons described in more detail below, Ms. Savariau is asking the Court to grant a variance below the appropriate guideline range of 51-63 months and to sentence her to no more than 24 months' incarceration.

I.    **Legal Standard**

The Court is well aware of the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[1]  As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors.  *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*, 555 U.S. at 352. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range.

---

[1] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

## I.    Background

The government obtained an indictment in December of 2021 charging Ms. Savariau with being involved in a conspiracy to commit fraud in the United States. She was arrested in her home country of Jamaica in the summer of 2023 and was arrested on her indictment on September 8, 2023. Although the allegations in this case were non-violent financial crimes, Ms. Savariau did not have a suitable release plan in the United States and so she was ordered detained pending trial.

Earlier this year, on April 16, 2024, Ms. Savariau pled guilty pursuant to a plea agreement to Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349. Contained in the plea agreement are various guideline possibilities that both parties have retained the right to argue. Ms. Savariau submits that the correct guideline range is 51-63 months. For the benefit of the bargain, Ms. Savariau had to forego the opportunity to argue that "intended loss" should not apply when considering loss amount under the sentencing guidelines and she has agreed to a loss amount of over $550,000 even though the actual loss amount was approximately $66,000. She will be before this Court for sentencing on September 19, 2024.

## II.    History and Characteristics

Ms. Savariau was born in Montego Bay, Jamaica to parents who were never married and who separated when she was only 5 years old. Unfortunately, her

childhood was filled with instability and abuse from the start. From a young age, Ms. Savariau witnessed her parents fight and sometimes get into physical arguments. When they separated, Ms. Savariau's father left the residence and she was left in the care of her mother and her maternal grandmother. Sadly, because of the drama and resentment towards Ms. Savariau's father, her mother and grandmother would take out their pain on Ms. Savariau because she closely resembled her father. Ms. Savariau's mother and grandmother verbally ███ ████████ abused her. This was one of the darkest times in her life as she was constantly told she was worthless and would not amount to anything in life. The abuse was blatant and public as her entire school was aware of the abuse and she was looked down upon by her peers because of it. Unfortunately, living in Jamaica during the 80's, there was not much a societal taboo against child abuse.

Thankfully, Ms. Savariau left her mother's house and went to live with her paternal grandmother, who treated her kindly and took care of her. However, this was short-lived when her mother decided to send her to boarding school. She hated it so much that she took her grandfather's offer to re-locate to the United States with him when she was 13 years old. ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

Finally, she was returned to Jamaica afterwards never to return to the United States again, until the instant matter.

When Ms. Savariau returned to Jamaica, she was finally able to live with her paternal grandmother long term after living again briefly with her mother. Her grandmother's place was the most stability she ever had growing up, residing there from 2003 – 2007 during her adolescence and early adulthood, and then again prior to the instant arrest.

Shortly thereafter, Ms. Savariau had her daughter at a young age. She lived with her daughter's father for a couple years but then was on her own again when the relationship ended in 2009. Ms. Savariau planned to continue her college education and obtain more degrees that would assist her with employment, however it became difficult while raising a daughter alone.

In 2009, Ms. Savariau met her ex-husband, L.G. She left him in 2015 after years of ████████ and verbal abuse. They no longer have a relationship and have no children together.

Ms. Savariau tried to find employment to the best of her abilities over the years. She held various administrative jobs until she finally found steady employment at Regal Caterers where she earned a decent income. Until then, she struggled greatly to support herself and her daughter, which is why she moved back in with her grandmother. Even still, Ms. Savariau could barely meet her daughter's basic necessities.

It is no surprise that Ms. Savariau does not have a good relationship with her parents today. They both reside in Florida but their relationship is strained. Her only sources of family support at this time are her daughter and her sisters, who also reside in the United States in Florida. Ms. Savariau's daughter, who is now 17 years old, wrote a letter to the Court describing her mother as loving and positive despite all of the harsh circumstances they have both had to endure. *See* Exhibit 1, Letter from Daughter. She explains that her mother "has always gone to great extents past her own feelings to ensure that I was fed, clothed, and sheltered." *Id*. Ms. Savariau's younger half-sister, Kandyce, also wrote a heartfelt letter to the Court describing her sister as loving, compassionate, and someone who has overcome adversity in her life. *See* Exhibit 2, Letter from Kandyce McPherson. She pleads to the Court explaining that she "firmly believes that [her sister] has the potential to continue making positive contributions to society, given the opportunity." *Id*. Ms. Savariau's younger sister, Serena, describes her older sister as her "teddy bear" and a "gentle giant." *See* Exhibit 3, Letter from Serena Savariau.

Ms. Savariau's close friend and cousin Maureen also took the time to write to the Court on her behalf and describes her friend as kind and generous. *See* Exhibit 4, Letter from Maureen Waller. Maureen also says that her cousin has "expressed genuine remorse for her actions and is committed to making amends." *Id.*

Lastly, Ms. Savariau's stepsister recalled specific experiences she had with her sister that highlight her dedication as a mother and her generosity towards her family. *See* Exhibit 5, Letter from Chanique Savariau.

## III.    Nature and Circumstances of Offense

Ms. Savariau is extremely remorseful for her role in this offense, as reflected in her early acceptance of responsibility even before any of the other co-conspirators were charged in this matter.

Ms. Savariau met her ex-husband, L.G., at a young age. With her history of poor male role models, she unfortunately could not see that L.G. was not a positive influence. As her family and friends explain in their letters to the Court, Ms. Savariau is a trusting and generous person. L.G. and others around her noticed that and preyed on those qualities. In addition, Ms. Savariau had her daughter at a young age and was not able to continue her college education until much later. As such, she felt dependent on L.G. When they separated, L.G. changed the lock on their apartment so that Ms. Savariau could not access her belongings. She had to go to court to obtain an order to be able to access some belongings for her and her daughter. By the time she got to the apartment with the court order, L.G. had

emptied the apartment and so her and daughter were essentially left with the clothing they were wearing.

The government's investigation into the instant offense actually began in 2011. It was not until 2015 that the government filed a civil complaint naming her and her ex-husband, L.G., as being involved in this scheme. The relevant time frame of the instant offense conduct is from 2016-2018, over 6 years ago.

L.G. and the other co-conspirators knew that Ms. Savariau was skilled in web design. Not realizing the full extent of what she was offering to provide and needing work, Ms. Savariau created the basic framework for the websites that became the face of the scheme. While she did participate and benefit from the scheme, when Ms. Savariau realized the full extent of what was occurring, she stopped. By that time, it was too late, and the other co-conspirators had what they needed to continue the scheme without her. They also were afraid that she would "out" them and so for several years she became the target of harassment by these co-conspirators. For example, one of the individuals who harassed Ms. Savariau called the police and falsely reported a kidnapping that never occurred naming her as the perpetrator. Ms. Savariau was arrested for this false report and was soon after cleared of the charges when they found the child with no incident. This is just one example among many forms of harassment that Ms. Savariau has had to endure because of her abandonment of this conspiracy.

Now that she has pled guilty, she is even more fearful that they will continue to target her. To this day, Ms. Savariau is afraid of them and is terrified that they will harm her when she goes back to her home country.

Throughout the scheme, however, Ms. Savariau did not profit like the other co-conspirators did. In fact, the government was never able to trace large sums of money going into her account. That is because Ms. Savariau was poor and did not even have enough money to properly support her and her daughter after she left her husband. Ms. Savariau was so destitute that she was living with her grandmother and had to choose what meals of the day she could provide for her daughter.

Ms. Savariau's role in this conspiracy did not provide her with a lavish lifestyle and it was not done out of any sort of greed for money. She was trying to get by in a cruel society while being taken advantage of by other more sophisticated co-conspirators.

Furthermore, while the government believes the intended loss of this scheme was over $550, 000, the total amount of actual loss involved in the entire conspiracy was approximately $66,000.

Lastly, since the time of the offense over 6 years ago, Ms. Savariau went back to school to obtain a higher degree to allow her to have her own career. Prior to her arrest, she was successfully employed as a customer service representative.

## IV.  Sentencing Guidelines

As stated above, the parties have retained the right to argue the appropriate guideline range based on a disagreement with whether certain enhancements and

whether a reduction applies. Based on the below arguments, Ms. Savariau requests that the Court find that the appropriate guideline range is 51-63 months.

### a. Contested Guideline U.S.S.G. § 2B1.1(b)(2)(B)

While Ms. Savariau has already agreed that her offense resulted in substantial financial hardship to one or more victims, she disagrees with the government and probation that the offense resulted in substantial financial hardship to five or more victims. Therefore, a four-level enhancement should not be applied under this provision and only a two-level enhancement should be assessed.

In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—

(i)  becoming insolvent;
(ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
(iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
(iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;
(v)  making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
(vi) suffering substantial harm to his or her ability to obtain credit.

Ms. Savariau has already agreed that these factors are met for one or more of the identified victims but the government has not met these factors to show that the offense resulted in substantial financial hardship to five or more victims.

There is not much in the way of precedent from the D.C. Circuit specifically, however the Ninth Circuit has reasoned that "section 2B1.1(b)(2) requires the sentencing court to determine whether the victims suffered a loss that was

significant in light of their individual financial circumstances." See *United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020). The court in *George* also noted that "by including 'substantial' before 'financial hardship,' the provision excludes minor or inconsequential financial harms." *Id* at 1185.

As the Seventh Circuit has explained, "whether a loss has resulted in a substantial hardship…will, in most cases, be gauged relative to each victim," and "[t]he same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup." *United States v. Minhas*, 850 F.3d 873, 877 (7th Cir. 2017).

The government has provided some victim accounts to probation contained in the PSR and in the government's sentencing memorandum, however probation and the government have not met their burden to show substantial and relative hardship based on these summaries. *See* PSR at par. 57. For example, one victim said their water and cable were shut off and some feared that they would be evicted but no proof that they actually were. Furthermore, the government identified individuals who accrued late fees on their rent. While these are real harms, they are not *substantial* and thus warranting an additional enhancement under the sentencing guidelines. The only victim that identified a harm that met one of the factors outlined above is the last one in par. 57 of the PSR – who explained that her credit was affected. Again, Ms. Savariau has already agreed to a two-level enhancement acknowledging that this victim was substantially harmed. However,

there is insufficient evidence to show that five victims had comparable harms that warrant an additional two-level enhancement.

### b. Contested Guideline U.S.S.G. § 3B1.1

Ms. Savariau requests that the Court not apply an aggravating role adjustment. While probation assessed a two level enhancement under U.S.S.G. § 3B1.1 (c) and not a four level enhancement under § 3B1.1 (a), Ms. Savariau submits that neither of these adjustments are warranted.

The U.S. Sentencing Guidelines provide for enhancements in a conspiracy fraud case based on the role in the offense. Under §3B1.1, the guidelines instruct to increase the offense levels as follows:

b) If the defendant was an **organizer or leader** of a criminal activity that involved **five or more participants** or was **otherwise extensive**, increase by 4 levels.

c) If the defendant was a **manager or supervisor** (but not an organizer or leader) and the criminal activity involved **five or more participants** or was **otherwise extensive**, increase by 3 levels.

d) If the defendant was an **organizer, leader, manager, or supervisor** in any criminal activity other than described in (a) or (b), increase by 2 levels.

The guidelines note that in distinguishing leadership/organizational role versus a management/supervisor role, the court should consider factors such as:

1) exercise of decision making authority,
2) the nature of participation in the commission of the offense,
3) the recruitment of accomplices,
4) the claimed right to a larger share of the fruits of the crime,
5) the degree of participating in planning or organizing the offense,
6) the nature and scope of the illegal activity, and
7) the degree of control and authority exercised over others

§3B1.1, n. 4. In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. *Id.* at n. 3.

Firstly, in analyzing an adjustment that punishes defendants on relative responsibility, probation and the government have failed to provide what the co-conspirators responsibilities were in order to determine what Ms. Savariau's role was relative to them. In fact, we have no information about the co-conspirator's roles. It would be unfair then to assign Ms. Savariau a role when we are not able to make that relative assessment. We do not have any information about what share of the profits were distributed to whom and the government has not provided any information suggesting that Ms. Savariau exercised control over other members of the conspiracy. *See* e.g., *United States v. Hunsaker*, 65 F.4th 1223, 1228 (10th Cir. 2023)( "to be a manager or supervisor under that subsection, a defendant must have 'exercised some degree of control over others' involved in the commission of the crime or 'must have been responsible for organizing others' for the purpose of carrying out the offense."). In fact, Ms. Savariau herself was recruited by another member of the conspiracy due to her website design abilities.

The D.C. Circuit Court of Appeals affirmed an enhancement for a leadership role in a bribery scheme where there were specific examples of the defendant exercising control over the other defendants in carrying out his kickback and cover-up schemes when he gave several orders to the other members about how to carry out the scheme. *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994). In this

case, those examples are not only absent from the record, they simply do not exist. There is no evidence that Ms. Savariau instructed other members of the conspiracy in any shape or form whatsoever.

Furthermore, the D.C. Circuit Court of Appeals reversed the finding of an enhancement for a leadership role when the record was devoid of any proof that the defendant was "hierarchically superior to her co-conspirators." *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004). The Court in *Quigley* explained that the Application Note 4 in §3B1.1 implies that there must be a hierarchical relationship when distinguishing between an organizer or leader from a manager or supervisor. *Id*. at 139. In this case, the government has not established any hierarchy that existed in the conspiracy and therefore the Court cannot even analyze or distinguish where Ms. Savariau fell within any hierarchy that may or may not have existed.

The government and probation's only argument for assessing a managerial role pursuant to § 3B1.1 (c) is that Ms. Savariau had control over the email addresses crucial to running the scheme. *See* PSR at par. 58-61. That does not mean she had exclusive control and simply means she had access to the accounts, which any member of the conspiracy would need. With respect to the government and probation's argument that those email addresses provided talking points and scripts for dealing with victims, that alone does not mean that Ms. Savariau herself developed or created those scripts and talking points. There is also no evidence that Ms. Savariau herself sent the other members of the conspiracy those talking points.

There is simply not enough evidence or information on the record to assess a role adjustment – especially when we know nothing about the other co-conspirators.

The overarching purpose of a role adjustment is to punish a defendant more for someone who exercised a leadership role and tended to profit more because that would tend to suggest they are more of a danger/and or are more likely to recidivate. In this case, Ms. Savariau does not have those characteristics that would warrant a more severe punishment. Probation and the government have not met the factors outlined above to prove by a preponderance of the evidence that Ms. Savariau had any leadership or managerial role and therefore a role adjustment should not be assessed.

### c. An Adjustment Based on U.S.S.G. § 4C1.1 is Warranted

The government and probation are incorrect that a reduction of two points is not applicable to account for Ms. Savariau's lack of criminal history. It is already established why she is not ineligible pursuant to §4C1.1 (a)(10) because an aggravating role adjustment should not be applied.

The government argues that Ms. Savariau is also ineligible for this reduction because she personally caused substantial financial hardship pursuant to §4C1.1 (a)(6). The sentencing guidelines do not define what would constitute someone "personally" causing substantial financial hardship. The government has shown that the overall scheme has created substantial financial hardship to one or more victims but has not shown how Ms. Savariau personally did so herself. There must be a distinction between the two for her to be ineligible to receive this adjustment

because the language of §4C1.1 (a)(6) includes "personally" where the language under §2B1.1(b)(2) does not include this word and rather says "if the offense resulted in" substantial hardship, the enhancement applies.

Because the government has not established that Ms. Savariau herself caused substantial hardship to an identified victim, she is eligible to receive this adjustment.

## V.    Unwanted Disparities

Although there are no two cases alike, a review of past sentences imposed for other types of fraudulent conduct show that a request for a variant sentence here is not unreasonable.

- *US v. Ahmed*, et al, 12-cr-110 (ABJ): In a health care fraud scheme where the government requested a sentence between 97-115 months' incarceration for defendant Carolyn Nolan, the Court imposed a sentence of 48 months' incarceration. Ms. Nolan filled a totally of 38 false prescriptions of OxyContin that the conspirators would then sell to the community. Ms. Nolan was one of the co-defendants' mother, who would obtain these false prescriptions because of her daughter's employment in a medical office where she was able to get a blank prescription pad. Ms. Nolan also had mitigating circumstances such as her age and her health.

- *US v. Abu-Ghosh*, 15-cr-139 (RJL): This was a scheme that resulted in an actual loss of approximately $1.3 million obtained fraudulently from individuals who believed they were securing loans but were actively being

misled by the defendant. The money came from "good-faith" deposits into the conspirator's accounts with no loans provided in return. The defendant agreed to a joint forfeiture agreement in the amount of $957,000. The Court imposed a sentence of 60 months' incarceration, departing upward from the original guideline of 41-51 months, partly because the defendant was found to be in violation of his pre-trial release prior to sentencing by allegedly committing a new fraud offense. While the government is seeking a much higher sentencing guideline range in this case, defense counsel submits the appropriate guideline range is more similar to the one in this matter – which ironically resulted in a much higher actual loss to victims overall. Had the defendant in this matter not violated pre-trial release conditions, the Court would have likely imposed a sentence of 41 months' incarceration, which was the government's original recommendation. Mr. Abu-Ghosh was 61 years old and was the sole support of his teenage children.

- *US v. Charity Keys*, 22-cr-236 (APM): The Court sentenced Ms. Keys to 12 months' and 1 day incarceration after she admitted to a bribery scheme as a public official that resulted in a loss of $150,000 to the D.C. government. Although the conduct in that matter was not similar to Ms. Savariau's conduct and did not entail identity theft, it is an example of a case that resulted in substantial monetary loss where the Court varied downwards from a guideline range of 46-57 months. Ms. Keys also overcame challenges

from her childhood and was a single mother with no criminal history just like Ms. Savariau.

## VI. Deterrence/Need for Rehabilitation

Specific Deterrence has already been met given the harsh circumstances that resulted in her continued detention here in the United States. Prior to her extradition, Ms. Savariau was arrested on the same charges by Jamaican authorities and detained. Then, she was extradited to the United States – alone – without her co-conspirators being charged alongside her – where she has remained for over a year. Given her lack of legal status in the country and lack of legal ties, she was not able to secure a good release plan. Typically, defendants like Ms. Savariau would have the benefit of pre-trial release given the non-violent nature of the offense and her lack of criminal history. Unfortunately, that was not in the cards for Ms. Savariau and she has had to endure the harsh realities of pre-trial detention – away from her family in a foreign country.

However, rather than be defeated by these circumstances, she has met this challenge and risen above. She has shown how she can rehabilitate so that when she is released, she can make a better life for her and her daughter moving forward. While at the ADC, she has used her time wisely and productively, completing several programs and has worked her unit as a barber to inmates. *See* Exhibit 6, ADC Certificates. Ms. Savariau has also sought the regular assistance of a mental health counselor, who has helped her navigate the jail system and provided counseling on an ongoing basis. Ms. McClung also wrote a letter to the Court asking

it to take into consideration all of the positive things Ms. Savariau has been doing while incarcerated. *See* Exhibit 7, Letter from Jail Counselor.

Lastly, the collateral consequences Ms. Savariau has and will continue to face are particularly severe in this case. Ms. Savariau had to agree to be deported back to Jamaica as a term of her plea agreement with the government, including any asylum claims. Given her fear of the co-conspirators, this consequence is severe and should be considered as further punishment she must endure. A lot of Ms. Savariau's family has migrated to the United States and she will never be able to join them here or raise her daughter here as originally planned. If Ms. Savariau is unable to immigrate to another country, she will be plagued in her small community with everyone knowing about this offense. She will likely be unable to find work.

## VII.   A Variance is Warranted Because the Loss Amount Guideline is Not Based on Empirical Evidence or National Experience and Fails to Promote Any Purpose of Sentencing.

Although the Guidelines are one factor to consider under Section 3553(a), the Court should conclude that a Guideline sentence in this case, even under the plea agreement's proposed Guideline range, is greater than necessary to accomplish the purposes of sentencing.  Accordingly, a Guideline sentence is inappropriate even as a starting point.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point."  28

U.S.C. § 994(m).  After initially setting the Guidelines, the Commission was then to

continually review and revise the guidelines in light of sentencing data,

criminological research, and consultation with frontline actors in the criminal

justice system.  *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15),

(16).  The original Commissioners failed to design the guidelines based on the

purposes of sentencing because they could not agree on which purposes should

predominate, and instead based the guidelines on an empirical study of time served

for various offenses before the guidelines.  *See* USSG, Ch. 1 Pt. A(3); Justice

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon*

*Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

      In *Rita v. United States*, 551 U.S. 338, 350 (2007), the United States Supreme

Court stated that it may be "fair to assume," at least as a general matter, that the

guidelines "reflect a rough approximation" of sentences that "might achieve §

3553(a)'s objectives" because (1) the original Commission used an "empirical

approach," beginning "with an empirical examination of 10,000 presentence reports

setting forth what judges had done in the past" and (2) the Commission can review

and revise the guidelines based on judicial feedback through sentencing decisions,

and consultation with other frontline actors, civil liberties groups, and experts.  *Id*.

at 348-50.  The Court in *Rita* also recognized, however, that *not all guidelines* were

developed in this manner.  *See Gall*, 552 U.S. at 46 n.2 (2007); *Kimbrough v. United*

*States*, 552 U.S. 85, 96 (2007).  When a guideline "do[es] not exemplify the

Commission's exercise of its characteristic institutional role," because the

Commission "did not take account of 'empirical data and national experience,'" the sentencing court may conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, *even in a mine-run case.*" *Id.* at 109-10 (emphasis added).

Section 2B1.1, the guideline applicable to the loss amount calculation in this case, is not based on empirical data of past practice or on national experience and, therefore, should not be followed. When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22-23 (1988). Unlike most other offenses, "economic crime guidelines were ratcheted up in excess of . . . prior judicial sentencing data." Mark W. Bennett, et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 950 (2017).

The Commission's rationale for the Guidelines they adopted was deterrence, however, the Guideline was not based on empirical evidence. The empirical research regarding white-collar offenders shows no difference between the deterrent effect of imprisonment and that of non-prison sanctions like probation. *See* David Weisburd et al., S*pecific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587, 589 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific

deterrent effect on potential white-collar offenders." Z. Gabbay, supra, 8 Cardozo J.
Conflict Resol. 421, 448-49.

The fraud guideline is not based on empirical data of past practice or on
national experience.  Because the Commission failed to rely on empirical data or
national experience in promulgating or amending the loss amount enhancements in
§ 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree,
on reasoned policy grounds, with its recommendation.  *See Spears v. United States*,
129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at
351, 357.

### VIII.  Ms. Savariau requests that the Court Consider a *Smith* Variance

Ms. Savariau is not a United States citizen and her incarceration in the
Bureau of Prisons will be more severe simply because of her status as a deportable
alien. Her status will increase the severity of her confinement and the length of
incarceration by eliminating the possibility of going to a halfway house.  *See United
States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (non-guideline sentence may be
appropriate because defendant's status as deportable alien would increase length
and severity of sentence); *see also United States v. Davoudi*, 172 F.3d 1130 (9th Cir.
1999) (authorizing discretionary departure when deportable alien could not be
considered for minimum security designation); *United States v. DeBeir*, 186 F.3d
561, 569 (4th Cir. 1999) (alienage serves as a potential basis for departure); *United
States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (district court may consider

whether harsher conditions experienced as a non-citizen cause a hardship and warrant a departure).

Any additional term of incarceration would be served within the BOP, and the BOP rules and regulations provide for differential treatment for aliens. The differences include, but are not limited to:

- Deportable aliens are not eligible for early placement into a halfway house or home confinement and must serve the entire length of their sentences, less good time credit;

- Status as a deportable alien increases a prisoner's housing classification level and requires placement in at least a low security institution, eliminating the possibility of placement in a minimum security facility or prison camp. *See* Federal Bureau of Prisons, Program Statement P5100.08, Inmate Security Designation and Custody Classification, issued September 12, 2006, ch. 5, p. 9 (noting that a deportable alien, which the Bureau of Prisons defines as "[a] male or female inmate who is not a citizen of the United States," is automatically assessed a mandatory public safety factor and is ineligible for the lowest level security classification);

- Under 28 C.F.R. § 345.35, deportable aliens are not eligible to work while in prison in the Federal Prison Industries Program; and

- Deportable aliens are frequently, if not always, ineligible for vocational training.

In short, because she is a deportable individual, Ms. Savariau would not receive the same benefits of programs within the BOP as other prisoners. Because her status would increase both the severity and the length of his sentence, a variance is appropriate. A variance is particularly appropriate here because Ms. Savariau did not illegally enter the United States. She was transported by the United States government on an arrest warrant. If Ms. Savariau had illegally

entered the United States in addition to committing the criminal offense against the United States for which he is being sentenced, a more severe sentence (in the form of the BOP restrictions) arguably might be warranted, but Ms. Savariau did not do so. *See Smith*, 27 F.3d at 655 (reduced sentence warranted when increased severity undeserved).

Ms. Savariau's sentence will also be increased as a result of the time necessary to deport her following the completion of any sentence imposed by the Court. After she completes her sentence, she will continue to be detained by immigration authorities until her inevitable deportation. So even a sentence of time-served would not be a true-time served sentence given the indefinite amount of time she will spend in ICE custody before being officially deported.

For all of these reasons, Ms. Savariau requests that the Court grant a *Smith* variance to account for the increased severity in her sentence due to factors that were not her fault and do not accomplish any goals of sentencing.

## **CONCLUSION**

For the above reasons, Ms. Savariau respectfully requests that the Court sentence her to no more than 24 months' incarceration.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org